# IN THE COURT OF APPEALS OF IOWA

No. 24-0984
Filed December 18, 2024

**IN THE INTEREST OF G.A.,**
**Minor Child,**

**C.A., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Susan Cox, Judge.


A mother appeals the termination of her parental rights. **AFFIRMED.**


Lynn Vogan, Juvenile Public Defender, Des Moines, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Felicia Bertin Rocha, Urbandale, attorney and guardian ad litem for minor child.


Considered by Greer, P.J., and Ahlers and Badding, JJ.

**GREER, Presiding Judge.**

A mother appeals the juvenile court's termination of her parental rights to her child, born in 2018. The father's rights are not of issue because in 2022, he died of acute methamphetamine toxicity. Shortly after the father died, the mother tested positive for methamphetamine and a child-in-need-of-assistance (CINA) proceeding was started, which ultimately led to this termination of her parental rights. In her appeal, the mother challenges the statutory grounds authorizing termination, disputes whether termination is in the child's best interests and contends the juvenile court should have applied permissive exceptions to preserve the parent-child relationship. She also asserts the juvenile court should have allowed her additional time to work toward reunification.

We conduct de novo review of orders terminating parental rights. *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022). In the three-step review process, we determine if a statutory ground for termination has been established, whether termination is in the child's best interests, and whether any permissive exceptions should be applied to preclude termination. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021).

The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(f) (2023). Under this ground, termination is authorized when the child (1) is at least four years old, (2) has been adjudicated CINA, (3) has been removed from the parent's custody "for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days," and (4) the child cannot be returned to the parent's custody at the time of the termination hearing. Iowa Code § 232.116(1)(f). And here, the mother only challenges the fourth element—whether the child could be

safely returned to her custody at the time of the termination hearing. *See A.B.*, 957 N.W.2d at 294 (considering whether the child could be returned to parent's custody at the time of the termination hearing).

As to the first step, we agree with the juvenile court that the child could not be safely returned to the mother's custody at the time of the termination hearing, thus, a statutory ground for termination was established. At the time the CINA proceeding was initiated following the mother's positive test for methamphetamine, the Iowa Department of Health and Human Services was already involved with the family due to findings that, prior to his death, the child's father had sexually abused the mother's oldest child.[1] And it was also around this time that the department's investigation revealed the mother had physically assaulted her stepdaughter, causing a large bruise. In June 2021, the department made a founded child abuse report against both the mother and the father, and criminal charges were filed against the father. The department voiced concerns that the mother was not acknowledging the danger the father posed to the mother's children, as she did not believe he was a harm to the children. Then in May 2022 the father died of an overdose of methamphetamine. Reports came to the department that the mother was using methamphetamine daily since the father's death. The department documented drug use and behaviors of neglect during the spring of 2022. The State filed a CINA petition as to the child involved in this proceeding and, in July,

---

[1] In addition to the child at issue in this appeal, the mother has two older children with a different father. Pursuant to a February 2023 stipulation between the mother and the father of those two children, the parents have joint legal custody of the children, the father has physical care, and the mother has visitation, but with an option to the father that he can request an observed drug test from the mother at any time.

the child was adjudicated a CINA. At the August dispositional hearing, the child was removed from her mother's custody and has not been returned since that time.

The permanency hearing was held in September 2023; the child remained in the custody of the department. In October, the State petitioned to terminate the mother's parental rights. The termination trial was scheduled for November 17. Four days before that trial, the mother provided a urine sample that was positive for alcohol. For reasons not associated with the mother, the termination trial was moved to January 18 and 24, 2024. After hearing testimony from the department workers and the mother, the juvenile court terminated the mother's rights to the child.

Here, we have the mother's words at the termination hearing, but we have nothing to show that her actions have changed. True, she does check the boxes of many of the requirements necessary to assure a successful reunification, but we must look to the priorities of those individuals who dealt with her over the course of the proceedings. Before the permanency hearing, the juvenile court previewed what had to change by the time of the termination hearing. The guardian ad litem (GAL) listed the following concerns:

> (1) [The child] has been out of her mother's care for thirteen months. (2) [The mother] lacks insight by choosing dangerous romantic partners, not understanding the high risk of harm for herself and for her daughter, if she was in her mother's care. (3) The mother lacks insight how substance abuse usage and minimal engagement in services to 'check off boxes' is not addressing the core of addiction. (4) Interactions have continued to be fully supervised without progress to semi-supervised and/or overnight interactions. [The mother's] recent actions to schedule [the child's] first therapy session . . . during the school day to hide that she would drive the child from school to therapy and back to school unsupervised is placing the child at high risk of harm. It is the opinion of the

> undersigned, that it is in [the child's] best interests to find her a safe, loving and stable forever home.

After that report, there were cracks in the mother's story about her progress. As noted by the juvenile court, several concerns remain and stand in the way of reunification—the mother's sobriety and her protective capacity, which are all inhibited by her lack of honesty. As to her sobriety, the mother contends she successfully completed substance-use treatment and transitioned to continuing care treatment in December 2022. Even so, the mother tested positive for both methamphetamine and amphetamine in January and April 2023 yet blamed the test results on contact during an intimate relationship with someone she met at a narcotics anonymous meeting. Testing in June and July produced negative results, but the mother was a no-show for her therapy appointment. During this time, the mother also failed to address the child's significant "visual decay" of her teeth and other dental-health concerns. Then in August, the mother again tested positive for methamphetamine and amphetamines via a urine drug screen. To the point that there has been progress—the incident over the mother's alcohol consumption cannot be taken lightly as this occurred just two months before the new termination trial date. Just days before the first termination hearing in November, the mother tested positive for alcohol; ten and a half hours after her claimed consumption. But as is her pattern, after testing for alcohol, the mother did not alert her treatment team or the department professionals monitoring the case about the results. And consistent with her lack of honesty, it was not until the department learned of the screening results in December that the mother told them she was celebrating her work raise by using alcohol ("I drank quite a bit") until the

late hours of the morning, contrary to the teachings of the substance-use program she claimed to have been attending at the time. In the termination order, the juvenile court described the mother's evasive behavior:

> The mother did not contact her substance abuse counselor re. the drinking. Even when the mother had a scheduled appointment with her counselor, she did not initiate the conversation re. drinking. She explained at her appointment with the counselor, *he brought up* the positive alcohol test. Then, she discussed with him what had happened. The mother rationalized not telling the counselor about the alcohol consumption on her own, by stating, "I wasn't aware that I would test positive for alcohol."

This history confirms the department social worker's opinion at the termination hearing that the mother was not meaningfully participating in aftercare.

What's more, the department's concerns involved additional unsafe behavior by the mother. The other concerns go directly to the inability to safely parent, which are unrebutted in this record and are serious.[2] In April 2023, the juvenile court alerted the mother that it was "very concerned [regarding] the mother's ongoing relationship with [her boyfriend] Tyler. He has a shockingly violent criminal history which includes violence against women and children." Despite this clear warning, the mother allowed her older child,[3] who had been sexually assaulted by the mother's husband, to engage with Tyler, now in jail, over videoconferencing. Likewise, it became apparent that the mother had involved Tyler against the directive of the juvenile court, as the child involved in this proceeding referred to Tyler as her "second best friend." Both examples show the

---

[2] As the juvenile court noted, the mother had a history of "unsafe relationship[s]."
[3] After removal because of the mother's physical abuse, the father was granted custody of this older child, but there was confusion in the record at the termination hearing over where the child actually resided.

mother's lack of protective care skills by involving her child with a person who might act contrary to the child's best interests.

As another red flag, the mother was involved with a therapist, who authored a positive report to the department in early July 2023. But in that report, it was clear that the mother made no mention to her therapist that in May Tyler committed a domestic assault against her that resulted in injury. A few days before the therapist's report was written, the mother sent a letter to the criminal court asking the court to drop the no-contact order against Tyler. To excuse Tyler's responsibility for the assault, she wrote that she "had been drinking earlier that day" and "tripped and fell." The May incident with Tyler also came at the time the mother was telling the solution-focused team that she had been sober for over a year. Although the mother violated the no-contact order when it was in place to see Tyler, she told none of the professionals, including the department or her therapist, until it was discovered at the permanency hearing. And when the department social worker sought more concrete information from the therapist over "how far they've come with domestic issues" it was apparent to the social worker that the issue was still unresolved. So, not only was the mother misleading the professionals helping her by indicating she was not seeing Tyler, but she was either lying about her use of substances or lying about Tyler's actions to defeat the no-contact order.[4]

During the summer months, there was a question about whether the mother's positive test for methamphetamine in August was from a faulty patch test.

---

[4] More recently, the mother claims she lied about drinking in July to take responsibility away from Tyler.

To support her claim that she was not using methamphetamine, the mother convinced her mental-health therapist her exposure was because she was cleaning an area where there might have been old residue of the drug.[5]  Still, a question remains over what caused the positive test just before the permanency hearing.  Because the possibility remained that the positive test was from the mother's use of methamphetamine, the juvenile court noted that around this time, the mother ignored the dentist's advice ("it slipped her mind") that the child needed significant dental care.  After two to three months had passed and the mother had not scheduled the follow up care, the maternal grandmother finally got the child back into the dentist.  The child had to undergo oral surgery.  The juvenile court surmised that the lack of follow through by the mother was consistent with her reverting to substance use.

Finally, over the course of the termination hearing, the juvenile court observed the mother's explanations of her behaviors throughout the summer and into the fall of 2023, concluding that it "did not find the mother credible based upon her demeanor when testifying which included long pauses and uncomfortable, palpable tension" at times.  "Although we are not bound by the juvenile court's findings of fact, 'we do give them weight, especially in assessing the credibility of witnesses.'" *In re M.D.*, 921 N.W.2d 229, 232 (Iowa 2018) (citation omitted).  And along that same line, during these proceedings, the maternal grandmother offered additional insight, noting that the mother made "it very clear to me that she knows

---

[5]  The mother contended that the methamphetamine residue existed on possessions owned by her deceased husband, who died in May 2022, two years earlier than the exposure.

how to play the system." Throughout this case the mother has said one thing and done another. When she has sought help through therapy, she has withheld information about her actions, minimizing any chance for lasting change.

We consider the on-the-ground observations of the juvenile court, the GAL, and the department social worker, as, over the years, they have grappled with the health of this family. While the record shows that the mother made some progress, we do not believe she has made enough progress to deem it safe for her to regain custody of the child at the present time. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (holding that "at the present time" means at the time of the termination hearing). In the end, termination of the mother's parental rights is warranted because the mother's lack of honesty and lack of insight impeded her inability to engage in safe relationships, to avoid harmful substance use, and to meaningfully engage in the professional services offered.

Pointing to her progress, the mother alternatively requests we grant her additional time to work toward reunification. The court may grant a parent six additional months to work toward reunification, rather than ordering termination, under certain circumstances. *See* Iowa Code § 232.117(5) (permitting the court to enter a permanency order pursuant to section 232.104 if it does not terminate parental rights); *see also id.* § 232.104(2)(b) (providing a permanency option of giving an additional six months to work toward reunification). But before the juvenile court may grant the additional time, it must be able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's

home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b).

The mother has made some progress in the months between the CINA permanency hearing and the termination trial, such as finding full-time employment and becoming financially able to meet the child's needs. Yet, in the juvenile court's view, the mother's success after a six-month extension was unlikely, noting that even with the benefit of services over *several years*, the mother "continues to be unsafe, for the same reasons." (Emphasis added.) And, as history has shown, even when the mother appears to be making progress for a month or two, her old patterns emerge after her deception is uncovered. Cracks in the story of success appeared throughout 2023.

As noted above, after viewing the mother's actions or lack of action before the permanency hearing and then after, the history does not point to a scenario where the need for removal of the child will no longer exist at the end of the additional six-month period. Instead, with our focus on stability and the best interests of the child, we note that the child was in the care of the maternal grandmother for nine months at the time of the termination hearing. The department social worker emphasized that the child needed stability and permanency. She testified that the child was doing very well in the grandmother's care, and the grandmother could transition to a permanent placement for the child, if necessary.

Here, given the history, the mother needed to show action, not just words. The deception and lack of insight shown by the mother shortly before the termination hearing are actions that defied the mother's words. With that in mind,

we do not disregard history and credibility findings that show the mother had not changed course so that she could safely parent the child. We affirm the juvenile court's termination of the mother's parental rights.

**AFFIRMED.**

Badding, J., concurs; Ahlers, J., partially dissents.

**AHLERS, Judge** (concurring in part and dissenting in part)**.**

I agree this child could not be safely returned to the mother's custody at the time of the termination hearing, so I concur with the majority's determination that the State established statutory grounds for termination. However, I part ways with the majority's determination that termination is in this child's best interests and denial of the mother's request for additional time to work toward reunification.

There is no question this family needed intervention for the reasons outlined by the majority. But since the permanency hearing, the mother has been on a positive trajectory, though not a perfectly linear one. She has stable housing, employment, and transportation, and she can meet the child's financial needs. She has consistently engaged in mental-health therapy and several programs to help maintain her sobriety. We know this not just from her testimony, but because she presented exhibits at the termination trial that support these findings.[6] A letter from the mother's therapist explained that she has gained insight into her past harmful relationships, explaining that she "is able to recognize maladaptive views that guided her previous codependency behaviors in her past relationships" and has "been successful in challenging these maladaptive views." This insight was on display at the termination trial when the mother testified about how she has learned to identify and avoid abusive paramours. Attendance sheets from Narcotics Anonymous show the mother's continued participation in the program. The office administrator at the medical clinic where the mother works provided a

---

[6] Because there is evidence from third parties that corroborate the mother's testimony, I do not place as much weight on the juvenile court's adverse credibility findings about the mother as I otherwise would.

letter noting that the mother "has always been to work on time and followed the rules of [the] clinic."  This evidence indicates that the mother is maintaining her sobriety.

Viewed through this lens of highlighting the mother's progress, I conclude that termination is not in the child's best interests and the mother has earned a six-month extension to work toward reunification.  As a result, I respectfully dissent.